Templin et al. versus Independence Blue Cross et al. Number 13-4493. Mr. Paduano, Mr. Kachin, and Mr. Obersatt. Whenever you're ready. Good morning. I please the court, Anthony Paduano for appellants. May I have three minutes, Your Honor? Yes, sir. Thank you. Your Honor, the court below assumed somehow that it was a voluntary act by appellees to pay us interest. It couldn't be further from the truth. Following the remand by this court, when we were here before, we had 13 discrete acts that resulted in appellees paying us interest, all the interest that was allowed by law that Congress allowed us to obtain. Well, I mean, there was a pretty big range in terms of what you sought and what you ultimately got. Absolutely. We had an aggressive theory. We got that which we were allowed by law 100 percent. The court actually says at some point on the record the court saw the range of between $20,000 and $68,000. After 13 sessions before the court that we've collected in our briefs, we finally resolved the matter, and it's resolved by covenant not to sue at $68,000. So that's where we resolve it at. We had alternate theories that we wanted much more. We get to press alternate theories. We get to try to expand the law. That's what lawyers do. Just a factual question. What's the difference between the claims that were sought in the marital litigation and the claims raised here? Nothing to do with each other. Entirely different claims. Some of the human beings are the same, but they're different medicines. These are hemophiliacs. These drugs are hundreds of thousands of dollars a month. Those are different batches of medicine, different shipments each month. Nothing to do with each other. Different laws, different shipments. Nothing to do with each other whatsoever. So I know they spend a lot of time on that, but it has nothing to do with what was before the court here. Nothing whatsoever. We were paid $0.10 on the dollar in the court below. We were paid $0.10 on the dollar in the court in there. Nothing to do with each other whatsoever. So we press really hard. We turn to the court before Judge Slomski below. We get all the interest we're impelled to, and we reverse. This court reverses Judge Slomski and sends us back specifically on that interest issue. They could have obviated all these festivities by simply, as this court has said, interest presumptively follows the payment of a claim. Was it always your view to accept the presumptive interest via the Treasury rate? If they sent us the check and I returned that check, I did so at my peril. That never happened. So I wouldn't have liked that, but I would have been stopped, frankly. That's one of the theories we had. That was clearly something we needed. In fact, this court gave us that guidance. That was one of the things that was there. So one of our theories this court identified is not. What was the trigger point? I'm sorry? What was the trigger point? At some point we're battered. We're battered. At some point we must surrender. It's an overwhelming burden. In fact, this court said at some point, and the courts throughout the country have said in the ERISA context, it's not the quantum that's received. At some point it's just the reinstatement of benefits. There's no dollars that are used. But at some point you must surrender. So we at some point, Judge Slomski said on the record, his range was between 20 and 68. So at some point the majesty and the power of the federal court will sober up anybody. So if a federal judge says to me I see the range of 20 to 68. I'll keep that in mind the next time I'm drinking. Thank you. If a federal judge says to me I see the range of 20 to 68 and the other side offers me 68, I'm going to roll down my flag at some point. So that's at some point what happens. And so we're done. That's after 13 sessions. That's after eight months of litigation below. So for the court below to say it's required to speculate as to how we get there, it's complete error, obviously. And with the Boyle case now saying that it's the pressure, the standard. So we have the catalyst. We have pressure. The Boyle case is actually now slightly, I think, dilutive. It's actually consistent now with what the Second Circuit's done, completely consistent with what Hart said. What deference do we give the judge's conclusion that he really did not spur his settlement? He made quite a few statements. He did talk about the 68,000. He did talk about the amounts available under the state statute. But he said his comment really was not a spur to your settlement. We give it no deference, Your Honor. We give it zero deference. I think it's intellectually a good comment. But you said the majesty of the judge and his opinion. I defer to the majesty of the federal court. Judge Slomski, I think, wrote the opinion of the opinion. I don't know why Judge Slomski wrote what he did. But I think, fairly put, the opinion doesn't jive with what happened before. To say that Judge Slomski didn't understand why we arrived where we did after eight months, following a remand on the issue, is irreconcilable. And when you do that in the face of Hart and Scarangella and the other authorities that we have, is irreconcilable. And Hart's very clear. It's some success on the merits. Judge Slomski decided that you have to have judicial action, a determination. That's not the law. That's not been the law for a very long time. And we briefed that extensively before him and argued that extensively. So now we have the intervening decision of Boyle, which clarifies very clearly that we just need the pressure of a lawsuit. So we're way beyond that here. In Boyle, we did way beyond that. But just to put it in context of how we got here, we were very clear as to what we were doing below and very transparent as to what we wanted, which was to collect from the time of our second amended complaint, because that's what this Court reinstated. You reinstated the second amended complaint, because when you reverse Judge Slomski on that ground, we then had that. We tried to – and Judge Slomski was very active in trying to have the parties come together. So that's how we got in this box in the first place. That's how we got in the box in the first time around, because the judge was very persuasive in saying, work it out, work it out. And when a federal judge says that to you, you're compelled to work it out. And we've done this a lot. So we did that. And that didn't work out. So we have a record where we don't have a disposition of emotion. We have different dispositions in various forms. But when we collect these interventions, we have, even by Judge Slomski's standard, this judicial action where he's guiding us constantly. And he walks back from when he says that he views the guidance from this Court. That's not fair. That's not reasonable. How long had you been negotiating? I mean, just to put this in the context of the judge's statement that you say spurred the settlement, how long had you been negotiating for the attorney? This is the attorney fee issue, right? Yes. Okay. How long had you been negotiating with your adversaries? And at what point in those negotiations did the judge make a comment that you say spurred the settlement? Well, more than two years. I mean, the negotiations over fees? Total. Well, yes, over attorney fees. They predate the appeal in this Court. They predate the first appeal in this Court. Okay. At some point they made a voluntary payment. That's never voluntary, Your Honor. Never. The interest fee, we make motions to compel the attorney's fee, the interest payment in this Court. We file a third amended complaint on the record in the joint charter. The Court below sets up a briefing schedule, a hearing schedule, and discovery on the issue itself for March of 2013. That results in the payment. The issue here is attorney fees to collect the risk on the underlying obligation. Correct. Is that fairly accurate? That's correct. That's what's before you, Your Honor. That's a very discreet issue. And one of the issues is the timing. How far back does those fees go? Because, in Judge Slomsky's opinion, it doesn't go that far. Our view is it goes back to the remand because your decision, Template 1, goes back to the remand, and the remand reinstates the second amended complaint. And that was the remand, that reinstatement, is for the interest of attorney's fees. That's what we did all once we got back before Judge Slomsky. That second amended complaint revised the issue of the interest issue itself. So when we went back there before, that's what we were knocking heads about. No aspect of this was voluntary. There's no extrinsic, extraneous factor outside the Court. The cases that appellants rely upon have either a legislative intervention, some action by a planned fiduciary, something that has to do with nothing that's outside the scope of lawyers. That doesn't exist here. If we were to agree with you on the catalyst theory, the judge then said, all right, the judge would say, okay, you're entitled to attorney fees in your effort to collect interest. But then you have the ERSIC factors that have to be weighed to see whether you should actually get the attorney fees. I say this to that. I think that ERSIC, especially the way Judge Slomsky looked at them, I don't think they have to necessarily be weighed. I don't think they have to. So ERSIC's a guide to discretion. Here, Judge Slomsky, a way to apply ERSIC was to gut Hart. And Boyle doesn't say that ERSIC must be applied. There's nothing from this Court that ever says ERSIC must be applied. It's one to guide one's discretion. So Hart says once there's a determination that some success on the merits makes one eligible for attorney's fees, that's the standard. Boyle makes it quite clear that once there's a determination that some pressure from a lawsuit is found, that makes one eligible for attorney's fees. I think then we go to the quantum. I think then we follow this Court's precedence on quantum of attorney's fees. I don't think ERSIC is to be read in any way to undercut, minimize, diminish what the Court's precedence are. I think that ERSIC now, in light of Boyle, is something that needs to be revisited because the way Judge Slomsky applied it, it's circular. And those factors aren't, frankly, I don't think they're good anymore. But once a court decides to engage the ERSIC factors, the conclusions cannot be overturned except for abuse of discretion. I think, Your Honor, I think ERSIC is mixed. I think it's de novo. I think there's a legal element to ERSIC. And I think the way that Judge Slomsky completely misapplied ERSIC, he completely overlooked the Court's determination that there was unexplainable delay in the payment of these claims. He never applied that as the law of the case here. And he said it was speculative, and he didn't know why the claims were played. Here, in Templar I, the Court said there's no explanation and there's unforgivable delay. I forget this Court's exact term. As to why the claims weren't paid. That's a factor that's binding on the ERSIC analysis. So the Court never balanced that at all, never factored it. The Court below didn't consider one of the ERSIC factors. That blows the entire analysis entirely at all. But to – But we don't know if it blows it, but that's the case law that says you should take every factor into account here. Right. But I don't think that the concept of remanding us now for the ERSIC analysis by Judge Slomsky, given that we've been here twice, on in some form it's overstating it, on the interest issue alone, I don't think, A, that's productive, but I don't think that the Court's precedents say that an ERSIC analysis must be done. It shouldn't necessarily be done in light of Hart. It surely must not be done in light of Boyle. I think that's too aggressive a reading of ERSIC. I think what ERSIC says from this Court is that use this, please, to guide you. This is something on a close call. This is from your guidance here. I don't think this is a close call in light of what you did in Templin I. I don't think this is a close call in light of what we have here after Boyle at all. Thank you. So you're saying this case is the opposite of John Dice and John Dice? No, John Dice. Thank you. Thank you. Ms. Gatchee. May it please the Court, Catherine Gatchee on behalf of Independence Blue Cross. My co-counsel, Mr. Obristat, and I have split our time by eight minutes and seven minutes. What do you want to cover? So the way we look at this case, the plaintiffs must overcome. What are you going to cover and what will Mr. Obristat do? I'm going to let you know that there are several distinct things, the hurdles they need to overcome. First, some success on the merits in Hart. I'd like to discuss that. There may be specific issues with respect to Mr. Obristat's client that he can address, but we'd like to address the some success on the merit issue and plaintiff's arguments with respect to the catalyst theory. And Mr. Obristat is going to address any questions you have specific to his client and then the ERSIC analysis that Mr. Paduano got into. Some success on the merits sounds like a pretty low bar. Okay. Well, what Hart says, Your Honor, is some success on the merits must be, quote, litigating success. That has to mean something. But it doesn't. And this may be the problem, at least that I personally have, with what Judge Slomski does. It sounds like it has to be judicial activity in his world, whereas it could be litigation activity in other worlds. In other words, he cites a second circuit case called the Scarangella. Scarangella. And it looks to him as if you need judicial activity that spurs the success or the settlement or whatever it might be. But other circuits, the Fourth, the Eleventh, and the D.C. Circuit seem to think it's litigation activity. So don't we need to weigh in on that legal issue? Well, I think this is not the case to do that, number one, because I don't think there was either of those. Well, if they hadn't brought the claim, there wouldn't have been a summing. Good Lord, they've been up and down, back and forth with regard to this case, right? Well, what Judge Slomski found was that they never exhausted their administrative remedies before they filed the claim. And had they done that, the interest, the days that passed between the resolution of their claims wouldn't have happened. And that's exactly what happened here. With respect to our client, we requested a remand to the administrative process because they had failed to exhaust. Judge Slomski agreed. That process was completed. The plaintiffs submitted additional information with respect to their claims during that process. And as to the claims, our client was determining at that time the claims were approved for payment. With respect to the other claims for our co-defendant care first, that was addressed in the Fourth Circuit opinion, the exact issue of what the catalyst was or was not for payment of those claims. Did you say the catalyst here? What was the catalyst here? Well, the plaintiffs alleged three distinct catalysts, and only three. And that's at page 24 and 25 of their briefs. And they say there are three catalysts, and that's a very interesting place to go. First, they say the filing of the Second Amendment complaint. The filing of the Second Amendment complaint in and of itself was a catalyst. That is a race to the bottom. If the filing of a complaint followed by a settlement in any ERISA case can give rise to some success on the merits, I would contend that you've now eviscerated Hart and the case law upon which it's based. And I think that's also inconsistent with this Court's prior en banc opinion in the Singer case, and that was a prevailing party statute. I believe, Judge Amber, you authored that opinion. But in that case, there was the filing of a complaint. There was a TRO hearing, which was granted. Subsequently, at the preliminary injunction hearing, the court suggested, the district court said to the state of New Jersey, why don't you interpret the statute in less than such a way? And the New Jersey state attorney stood up and said, we agree, in an open court, change their position. Let's come back to the, you say they alleged three catalysts. Number one was the filing of the Second Amendment complaint. What was second? Number two was the Third Circuit remand in July of 2012. The interesting note about that, when you remanded the case to Judge Slomski, saying that the interest issue was not moot. You didn't determine that they were entitled to interest. And what your opinion did, that panel decision, it affirmed the dismissal of the Pennsylvania statutory claim for interest against our client, which was a punitive, much higher interest rate the plaintiffs were originally seeking. Judge Slomski dismissed it. The Third Circuit affirmed that dismissal, finding there was no private right of action. That can hardly be said to be a catalyst for our client to settle. It was a victory for our client. And what was the third purported catalyst? The third one is this January 2013 hearing before Judge Slomski. What Judge Slomski said was that, repeatedly, he did not make determination on the merits at that time, which is accurate. What happened in that case is significantly different than the judicial acts involved in Hart. In Hart, there was summary judgment filing that the plaintiff was totally disabled, that if the lower court didn't reconsider the decision on remand and give her a full review, they would enter judgment. Hart's judicial action in that case is very different than what happened with Judge Slomski. Mr. Paduano had three bases to collect attorney fees, two state statutes, right, if I'm not mistaken, Pennsylvania. Two state statutes in ERISA, three bases. Three bases. $1.8 million. All right. Now, Judge Slomski essentially disparaged two of those bases, the state statute. He said, you know what, these are going to be punitive, and they probably would not apply. But you have a treasury note, a rate, 65, which would amount to $68,000 within six or seven weeks of the case is settled, after years of litigation. So their point is, you know, that comment spurred the settlement. But for the judge's analysis of the different bases for attorney fees, the case may not have settled. Well, I think, first of all, the Pennsylvania state statute was dismissed by the punitive interest rate sought by Pennsylvania's Act 68 was dismissed by Judge Slomski and affirmed by this Court. So what remained on remand was the Maryland statute, which sought, I believe, under which plaintiffs sought $1.5 million in interest in ERISA. Yeah, but the judge said he's not likely to consider that. Right. He pretty much said he wouldn't consider it. So whose conduct was catalyzed then by that comment? Plaintiffs. They were seeking $1.5 million going into that hearing. They took 4% of that combined between the plaintiffs for $68,000. There was no change in position by the defendants. Mr. Oberstadt will show you evidence in the record. They've been offering the T-bill rate all along. The plaintiffs said no. So you say that comment by the judge did not spur the settlement. The judge asked the parties to discuss settlement. I think judges do that all the time. I don't think that's a remarkable event. I think the plaintiffs went into that hearing seeking $1.5 million in interest. And if those comments catalyzed anything, I think they catalyzed the plaintiffs to raise the white flag or whatever Mr. Paduano just said. I don't think they catalyzed defendants. Do you think ever a judge's favorable comment in the course of judicial proceedings could serve as a catalyst? Well, I think if you look at Hart, that's what happened. The judge, in a written opinion, said we find Ms. Hart totally disabled. We find the lower court did not give her full and fair review. You do agree that catalyst theory can be adopted in the ERISA context, do you? I don't think it can, and here's why. Let me tell you why I think that that's the case. First, I think it's factually inapplicable here. We did say that it could in a not-presidential opinion, didn't we? You did, and I think it's a very different case that leaves open a lot of questions that were not addressed. One of the issues that Judge Chesler addressed in the district court opinion in Boyle was this premise out of Hart that a prevailing party statute and a partially prevailing party statute are some success on the merits statute. He talked about it doesn't change, it changes how much success a party may be entitled to. It doesn't change the type of success. Can you tell me why the rationale that you feel a catalyst theory would not work in an ERISA context? By definition, I think a catalyst theory requires analysis of a defendant's subjective motivations for settling a case. I think the ramifications of that could be endless. Any business decision, it could implicate privilege. Why do people decide to settle litigation? The court would have to conduct a second trial on those issues, and Hart and its predecessors specifically prohibited that. Are you asking us to create a circuit split? Because you've got in 2002, the 11th Circuit said that you could have the catalyst theory applies. 2003, the D.C. Circuit says that. 2007, the 4th Circuit says that. And then Scaringella from the 2nd Circuit says it, albeit with respect to judicial activity. Scaringella requires judicial activity, and the 4th Circuit. But is there anybody that goes the other way than these circuits? I think the 4th Circuit in the Feldman's case, which is probably as good a time as any for me to concede the floor to my co-counselor, was his client involved in that case. The 4th Circuit in the Feldman's case, which is also one of the plaintiffs here, Feldman's Medical Center Pharmacy, specifically held that the catalyst theory wasn't applicable in this ERISA context. But you've got Ohio Valley Environmental Coalition versus Green Valley Coal, which is 5-11-5-3-4-0-7. That's the 4th Circuit case from 2007 that says the catalyst theory can be applied. Pre-HART, Your Honor? Yeah, but HART's actually somewhat helpful. All you need is some, a very low threshold, some success. Litigating success that's not trivial and not procedural and doesn't require a mini-trial. And that's what a catalyst theory would require here, on the subjective mindset of parties that are trying to settle litigation. That is counter to ERISA's prompt resolution, overarching policies, and we don't think it's appropriate. Let's hear it from Mr. Obersted. Thank you. Good morning, Your Honors. May it please the Court, Mark Obersted of the law firm of Archer & Greiner on behalf of Carefirst of Maryland, Inc. I'd like to start, Judge Ambrose, with the question that you first posed to Mr. Padawano, which is the trivial nature of the relief that was granted here in the context of the settlement. The $68,000 of prejudgment interest versus the between 1.5 and 1.8 million that was sought. That was clear. That was one of the reasons that Judge Barnsley gave. I'm trying to sort out the law here first on catalyst theory. Is there any circuit court decision to say that the catalyst theory is not applicable? I'm not aware of any circuit court that has made that decision. What I have seen and what we see here, for example – So what decision do you want us to make? Do you want us to say the catalyst theory is applicable, but we should follow the second circuit and say it's only judicial activity and not litigation activity, as three other circuits appear to say? Is that what you'd like us to do? I think if we're going to adopt the catalyst theory and decide that it applies, I think that is the way that we have to go for a number of reasons. Number one is the fact that we have the Buchanan decision, the Singer decision. There's no reason to think that simply because you need less success needs to change the nature of the success that you need. That was what we had here in Singer. That's what we had in Buchanan. You do need some type of judicial involvement in order to have the catalyst theory apply. So what would happen if the judge is not really involved and before the judge really becomes actively involved, a suit's filed, and there's some discussions that take place, and ultimately you decide, you know what, we're not even going to go before the judge. It's just time to settle up. Let's just cut our losses and get out of Dodge. And so, therefore, you're saying the catalyst theory, that's not litigations, that's the catalyst for the settlement? That's correct. And, in fact, if you look at Buchanan, those issues were actually raised in the Buchanan case, and it was said, well, what if this just causes the defendants in these cases to moot it out? They don't want to pay attorney's fees, so they're going to resolve the case. Okay, so you need judicial involvement. You do need judicial involvement. Now, so how about this case, then? You did have judicial involvement. We did not, and let me walk through. The three catalysts, again, that the plaintiffs allege are the basis. One is the filing of the complaint. That does not involve any judicial involvement at all. The second was the appeal to this court the first time in the remand. There, the court did not address the merits of the claim at all. At some point, there was a hearing in a courtroom. All the parties were present, and the court gave the parties a tentative analysis of the merits of various claims. And within that analysis, there was a certain stressing of a $68,000 Treasury rate. And what the catalyst theory requires, in addition to judicial involvement, it requires a change of position by the party that settles how the matter gets resolved. You don't think there was a change of position from a million-some dollars to $68,000? That was a change of the position on the plaintiff's side. What we need to have is a change of position on the defendant's side. And what we have presented in the record is the fact that CareFirst offered to resolve this case, the Treasury bill rate, from the very beginning. We offered to do it before the Templin I appeal. We offered to do it before the judge made his comments. If anyone was catalyzed, it was not the defendants. It was the plaintiffs who moved from the 1.5. But they initially made claims that you turned down, correct? CareFirst turned them down? There was a licensing dispute. That's correct. So they refused to pay. Why did you agree to pay the claims during the court-ordered administrative process? The claims that CareFirst agreed to pay had nothing to do with the administrative process. There was a licensing dispute which was resolved outside of litigation by CareFirst going to the appropriate authorities in the state of Maryland to address a very important issue. And that was the fact that plaintiffs who initially said that they were going into homes and infusing these patients directly, they were directly going into the homes, which was what required them to have this home infusion therapy license, change their factual position under oath, and said, we now just drop ship the factor. CareFirst then, instead of litigating the matter, went back to the appropriate authorities in the state of Maryland and said, based on this change of position of the plaintiffs, do they need this license? The state of Maryland said, no, under that condition, they do not. CareFirst could have litigated the veracity of the change in position, but said, we're not going to do that. We're going to have these claims paid. We made the plaintiffs aware of that before they even filed the Second Amendment complaint. And so this was all laid out in great detail in the Maryland case. Let me switch to the time we have left. The IRSIC factors. IRSIC is a case from our court from 1983 that says there are five factors, and then we have a case in 1992 called Antwies, which says it's mandatory that you consider all five factors. And it's clear here that the district judge did not consider the fifth factor, which is the relative merits of the parties' positions. Doesn't that? I would disagree that he didn't consider it. He determined that it was neutral. And the reason he determined it was neutral was because he did not, he was not required by the parties to make the decision on the interest question. And the reason was because we settled the case. Now, if the district judge is required, in the context of a settlement, to then decide an issue that was resolved through the settlement, is that an appropriate use of judicial time, or should the court do what Judge Slomski did here, which is determine that it's neutral? That, to me, seems the better course under IRSIC, and let's assume that we remand it for that basis. What are we going to find? We're going to find that the plaintiffs here on this appeal have made our case. Because by contending that $68,000 was the full amount of interest that they were entitled to receive, that was the position that the defendants were taking before Judge Slomski on the interest issue. So if we go back on the relative merits, it can only go one way. There is no ability for Judge Slomski to turn around and say, well, if I had to decide the motion, even though the parties settled it, I would decide that they had the relative merits in their favor. That's not possible on this record. Unless your honors have any further questions, I see my time is up. Thank you. Thank you. Mr. Paduano. The conduct case that was cited is from 2001. It has nothing to do with ERISA. It's 12 years before the Hart case. These appellees constantly took the position in record, in court, in writing. They were entitled to no interest whatsoever. The court can see the citations in the joint appendix. These are their papers. They never, ever made any type of offer at all. They never made any filing for interest. What Mr. Obermeier just referred to was some mediation offer but required the waiver of attorney's fees and a general release that would have compromised the corporate plaintiff's ability to file other cases. The court, seeing that there are recitations of related actions in Florida and Maryland, the corporate parties, they claim, have related cases pending in state court in Maryland and state court in Florida. So they sought to have those claims extinguished, and we refused. So what they didn't say in response to the court's questions are why they finally paid the $68,000 in interest. They were compelled to because just the way we were, Judge Slomsky said this is the way he's going to come out on it, between 20 and 68. We said it's got to be 68 or we're going to continue to press this in terms of filing papers, and we filed a third amended complaint. That's the way this came out. The catalyst theory obviously is a lesser standard than Hart. It's subsumed within Hart. It's not a theory of recovery. It's just another touchstone the courts have applied. But I don't think the circuit should stand out. What is the standard? When do we say that the catalyst theory, in fact, applies in a given case? I think it's just what Boyle says. It's just pressure. It's another way to look at Hart. Yeah, but Boyle is a non-presidential opinion, so we can't hang our hat on that. I understand. You can't. We can't. I understand. I'll take whatever hat I can get, but it's just a way to look at it. You don't have to have a decision. There does not need to be an order from a district court, and there shouldn't be. Otherwise, everyone's going to litigate to the end, and that's not the way it's supposed to be here. How do we know that the judge's analysis spurred the settlement in this case? It couldn't be more clear. He said, I see the result between 20 and 68. What could be more clear? I mean, we have motions pending before the judge. He sets a trial schedule that says you're going to conduct discovery, we're going to have a pre-hearing conference, and we're going to have at the end of March 2013, we're going to have a hearing. But I see it between 20 and 68. You guys can go out and do whatever you want. Knock your hat. Counselor, if we were to determine that there is some success on the merits, would a remand to the district court be in order for it to consider the ERSIC factors? I think not, Your Honor. I think that we've had enough here. I think that Judge Schlomsky had the chance to have his guidance set by ERSIC. I don't think ERSIC is required by the court. I don't think it is. I think it guides the district court's judgment. In here, the court between Templin I, who I think will be Templin II, has, if it makes the determination we're eligible for fees, it's got a pretty full record in front of it on a pretty narrow issue. And if it makes the determination we're eligible, I think that it gets to say that there's some success on the merits. I don't think we have to go through the full panoply of the ERSIC guidance for the district court. I think you get to skip that and go to the quantum, because otherwise I think we're putting form over substance. Because ERSIC is there for the determination of culpability and the like. You've made that determination in Templin I. It's an unexcused delay for the payment of the claims. And that is the presumption this court's got the guidance. Interest presumptively follows that. We don't need the district court then to apply again. This court's got the law of the case on those issues. The other factors, a deterrence, we've already done that. I mean, we've done that. This court's got enough there, there's enough public policy with its decisions, benefit to the plan members, that follows from this. We're not supposed to go through that process. I don't think it's mandatory. I don't think we need to go through that form over substance at all in any way. And the fact that Judge Slomsky didn't do it the first time, three times on the same issue, no. I don't think so, Your Honor. I don't think the court has held that you must apply these guidelines to make a determination after this court's made the analysis that you have an eligibility for attorney's fees. I don't think so, Judge.  Thank you very much. Thank you. Thank you. To both counsel, we'll take the matter under advisory.